[Crim. No. 2014. First Appellate District, Division Two.—August 22, 1938.]

THE PEOPLE, Respondent, v. EMILE GROSSMAN, Appellant.

194

Frederick Dubovsky for Appellant.

U. S. Webb, Attorney-General, Wm. F. Cleary, Deputy Attorney-General, Earl Warren, District Attorney, J. F. Coakley, Assistant District Attorney, and Arthur H. Sherry, Deputy District Attorney, for Respondent.

STURTEVANT, J.—Emile Grossman, an attorney licensed to practice in the state of California; Louis Kameny, a physician and surgeon likewise licensed to practice in this state, and Adrienne Udstone were indicted by the grand jury of Alameda County on July 30, 1937, for the following offenses, charged in six counts, in this order: 1. Conspiracy to commit grand theft. 2. Attempt to commit grand theft. 3. A violation of section 556, subdivision a, of the Insurance Code. 4. A violation of section 556, subdivision b, of the Insurance Code. 5. A violation of section 556, subdivision b, of the Insurance Code. 6. Conspiracy to violate section 556 of the Insurance Code.

All were tried. Grossman and Kameny were convicted as charged in the indictment; their codefendant, Adrienne Ud-

stone, was acquitted. The defendants Kameny and Grossman made motions for a new trial, which motions were denied, and Grossman appealed from the judgment of conviction and the order denying his motion for a new trial. The appellant will hereinafter be referred to as the defendant.

In preparing his brief the defendant has not clearly stated his points. He has stated many academic propositions, a discussion of which will in no manner tend to show whether any error was committed by the trial court. However, from every word we see he is earnestly contending the evidence does not show guilt. We think it does show guilt and therefore we will set forth a *résumé*.

On April 13, 1937, Mrs. Adrienne Udstone went to the Central Beauty Shop, owned and operated by Mrs. Anna Boggs, at Seventeenth and Broadway, Oakland, California, and ordered a permanent wave. During the course of receiving the permanent wave Mrs. Udstone complained that one of the curlers was hot. Mrs. Boggs asked her if the curler should be removed, but Mrs. Udstone replied she thought that was unnecessary. Mrs. Boggs, however, placed some cotton under the curler and Mrs. Udstone then stated that she was comfortable. Mrs. Boggs examined the place where Mrs. Udstone had complained of the heat, but could find no injury whatsoever. The portion of her head complained of by Mrs. Udstone was at the hair line on her neck and about two inches behind the right ear. Before Mrs. Udstone left the shop, Mrs. Boggs rubbed some medicated cream in the vicinity of the spot. On April 23d, defendant, Emile Grossman, came to Mrs. Boggs' shop. He inquired for Mrs. Boggs and asked her if she carried insurance. She replied that she did not, and the defendant then stated: "Now, you have a bad case of a burn on your hands and I am an attorney, and wouldn't it be wiser for you to take out insurance and pay the premium of the insurance; it would be cheaper for you to do that than to have the publicity of a lawsuit on your hands." Defendant went on to say it would be cheaper for Mrs. Boggs if she carried insurance and stated that in that way Mrs. Boggs could avoid publicity. Mrs. Boggs replied: "Yes, it would be all right to take out insurance but the doctor's record would have to be the same." The defendant stated the date of the accident could be postponed and when Mrs. Boggs

asked how that would be shown by the doctor's record, he replied she need not worry about that, that he would take care of it. Defendant at that time offered to find out for Mrs. Boggs who wrote insurance for beauty shops, and made a telephone call, in her presence, in which he asked who wrote insurance for beauty shops. After receiving the information he desired, he hung up and called another number on the phone and handed the receiver to her, telling her it was an agency for Lloyd's of London, and asked her to talk to the party. She talked to a Mr. Hoepner, of Tallman and Hoepner, and he told her he would come in later and see her and would send her an application in the meantime for her to fill out. Mr. Grossman then left and on April 27th Mrs. Boggs received an insurance application for beauty parlor liability insurance in Lloyd's of London. From April 23d to the 27th the defendant phoned Mrs. Boggs every day, some times two or three times in the same day, asking her about the application, whether or not she had received it, and generally urging her to proceed to obtain insurance. Mrs. Boggs, during one of these conversations, asked defendant for Mrs. Udstone's address, which he refused to give her but did refer her to his codefendant, Dr. Kameny. Mrs. Boggs, in the meantime, spoke to Edward F. Hansen, who is an insurance broker, and asked him what to do about the matter. After speaking to him she went with him to the office of Kennedy and Salisbury, attorneys practicing in Oakland, because she wanted advice. She talked to Mr. Salisbury and he suggested that she report the matter to the office of the district attorney. Therefore, on May 6th she went to the district attorney's office and informed Assistant District Attorney J. F. Coakley of what had occurred up to that time. At his suggestion she called on James Tallman, a member of the firm of Tallman and Hoepner, insurance brokers. Mr. Hoepner, with whom Mrs. Boggs talked at the defendant's suggestion when he first saw her, is a member of that firm. Through that firm she applied to Newhouse and Sayre, Inc., agents for Lloyd's of London, for a liability insurance policy on the beauty parlor. At that time it was her intention to obtain an insurance policy. From May 6th to May 17th Mrs. Boggs was out of town on a trip, leaving her shop in charge of a Mrs. McLay. Before leaving, however, she talked with the defendant on the

telephone and told him she had applied for the policy and that it would be in her shop. On May 10th or 11th, the defendant went to Mrs. Boggs' shop and obtained the insurance policy which had been issued by Lloyd's of London to Mrs. Boggs. Defendant called upon Mrs. Boggs again on May 19th, and inquired about the policy and particularly wanted to know whether or not she had paid for it. At the same time he asked her to come to his office on the next day. In response to his invitation, Mrs. Boggs went to his office and he told her not to worry about the insurance company if it did not come through. He told her not to worry about the doctor's record, that he had taken care of that. He suggested at that time that she should have Mrs. Udstone return again to the beauty shop and have some sort of treatment so that a new date could be established as the date of the injury. The next day he phoned Mrs. Boggs and told her Mrs. Udstone was in his office and asked if she could come to the beauty shop for treatment on that day. An appointment was made and Mrs. Udstone went to the shop and received a treatment, during the course of which no heat of any kind was applied. On May 26th, Mrs. Boggs received a letter from the defendant in which he said: ''On May 21, 1937, Mrs. Udstone after receiving a permanent wave in your establishment suffered a severe burn on her neck.'' Tallman and Hoepner had issued a receipt acknowledging payment of the premium on the policy to Mrs. Boggs and she had told the defendant if he wanted to see the receipt he could come to her shop and see it. It is true that Mrs. Boggs had not made any actual payment at the time the receipt was issued, but it was not until the 18th or 19th of May that she knew she was not expected to make any payment on the policy. After receiving said letter from the defendant, Mrs. Boggs phoned to him from the district attorney's office on May 27th. A stenographer attached to the district attorney's office listened in and later made a transcript of the conversation and it appears in full in the transcript on appeal. In this conversation the defendant told Mrs. Boggs to give his letter to the insurance company. On the same day defendant saw Mrs. Boggs at her shop about noontime; he appeared very excited and asked Mrs. Boggs to be sure to remember the day of May 21st. The defendant phoned to her several times thereafter to inquire

whether or not she had heard from the insurance company. On June 14th, he again spoke to her and urged and reminded her not to forget that the claim was based on the date of May 21st. The policy itself had been issued on May 7th, and was delivered to her on May 8th. Mr. Tallman testified that he wrote to the defendant on June 10th to the effect that the letter which defendant had sent to Mrs. Boggs on May 26th had been delivered to Newhouse and Sayre, the agents for Lloyd's of London. Mr. Tallman testified that he is an insurance broker. The contract of insurance was a contract issued by Newhouse and Sayre, Incorporated, as general agents for Lloyd's of London. Tallman and Hoepner, in turn, represented Newhouse and Sayre. The policy was issued at their request. It was a valid, binding contract. The contract was subsequently canceled on July 27th. Mr. Toso, vice-president of Newhouse and Sayre, testified that pursuant to his request the risk was covered and that the insurer was liable for any claims arising after April 27th, the opening date of the contract, even before any written memorandum or agreement had reached his office. In this respect Mr. Toso testified: "We had a telephone conversation with Mr. Tallman on April 27, where he asked me to bind this risk. I told him subject to a satisfactory application, which he promised to obtain for me as soon as possible." He further testified: "Well, we agreed to cover the risk on April 27; if there had been any claim presented from that date on, we would be responsible, even though our written contract has not been issued. It is our office rule not to put our contract out in form until we had the necessary details, which in this case would be the completed application, in the meantime, giving our word this coverage was in effect." Mr. Toso also testified that his firm was authorized to handle adjustments under contracts placed with Lloyd's on behalf of the insurers. The contract of agency between Lloyd's of London and Newhouse and Sayre was introduced in evidence and the contract issued to Boggs was delivered pursuant to this contract. No payment was due under the contract at the time it was issued. He also testified that defendant made a claim against this insurance policy on behalf of Mrs. Boggs against Newhouse and Sayre and Lloyd's of London in a letter directed to them by defendant. After that claim was presented, Newhouse

and Sayre authorized a firm of investigators, E. H. Bockius & Company, of San Francisco, to make an investigation. This investigation was conducted by H. G. Austin, an investigator and adjuster employed by the Bockius Company, on June 12th. On June 16th, Austin called on defendant at his office and talked with him about the claim. At that time the defendant stated the alleged burn had been suffered by Mrs. Udstone on May 21st, and offered to accept a settlement of the claim for $500. He took Mr. Austin to the office of his codefendant, Dr. Kameny, who told Mr. Austin that he first saw Mrs. Udstone on May 22d, and gave a medical description of the burn to the investigator. In truth he had first seen her in April. June 17th, Mr. Austin visited Mrs. Udstone at her place of employment. He asked her if she knew what date the accident happened. She said she did not recall but whatever date her attorney stated was correct. The defendant had stated the date was May 21, 1937. On June 28th, Mr. Austin received a telephone call from defendant inquiring concerning the progress made in settling the claim and he promised to send Austin a copy of the medical report prepared by Dr. Kameny. Mr. Austin identified a copy of the report which was subsequently received in the mail from the defendant and it was introduced in evidence. On July 6th, in another telephone conversation, Mr. Austin asked for the original medical report and defendant told him he would get it for him. There were a number of other conversations in which the defendant and Mr. Austin discussed various amounts ranging from $200 to $500 as a basis for settlement. In one of these conversations on July 16th, Austin again asked for the original report and discussed the matter of settlement further, and on the next day, July 17th, Mr. Austin received that report. Finally, in a conversation on July 23d, defendant stated that it was satisfactory to him and to Mrs. Udstone to accept the sum of $350 in full settlement of her claim. Mr. Austin then made an appointment with defendant to meet him at his office on July 24th and pay him the $350. On that day Mr. Austin was late for the appointment but waited around defendant's office in an unsuccessful attempt to see him. It had been agreed that defendant would, at that time, have Mrs. Udstone in his office to sign the necessary papers in connection with the settlement. By prear-

rangement with the district attorney's office and police department, defendant, Dr. Kameny, and Mrs. Udstone were to be arrested immediately after delivery of the check and the signing of a release and several officers had been stationed in defendant's building for that purpose. The defendant, however, left the building with the result that when Mrs. Udstone arrived he was not there. After waiting for about an hour, during which time Mr. Austin and Mrs. Udstone were conversing, Austin suggested that Mrs. Udstone accept the draft which he had and sign the release in defendant's absence. This Mrs. Udstone did. Both the draft and the release specified May 21st as the date of the alleged burn and this was called to her attention by Mr. Austin. She signed the release, received the check, and was arrested. Later that same day officers from the district attorney's office and the police department, armed with a warrant for the defendant's arrest, found him hiding behind a shower curtain in the bathroom of his home fully dressed. At the time that Mr. Austin had been negotiating with defendant, the latter had a file on his desk upon which the name of Mrs. Udstone appeared, but after his arrest the defendant stated he had no file whatever in connection with the case. Dr. Kameny was also arrested and his records, which were taken upon a search warrant, showed he had changed the date on his medical history card from April to May. Following his arrest the defendant was taken to his office. Outside of the building he met a deputy district attorney and before any words were addressed to him whatever, he stated there was no file in the case (indicating that he had become frightened and had destroyed the file which Mr. Austin had seen.) A search of the office failed to reveal the file. After his arrest, defendant made no explanation of his hiding in his bathroom and refused to explain the absence of the file mentioned above. A desk diary which was discovered in defendant's office showed that as early as April 23, 1937, he spoke to Mrs. Udstone about her alleged claim against Mrs. Boggs. Further entries showed a number of calls from Mrs. Udstone prior to May 21st. The diary further showed the visit on the part of Mrs. Boggs on May 20th corroborating her testimony in this regard; a visit of Mrs. Udstone on the same day and a visit by Mrs. Udstone again on May 21st, the date she was sent to

Mrs. Boggs' shop for a treatment upon which the false claim could be predicated. At the trial it was proved by the testimony of an expert and admitted by Dr. Kameny that the medical report on Mrs. Udstone had first been dated "4/27/37", and at some later time the figure "5" was superimposed over the "4". Defendant took the stand and testified in his own behalf. He stated that for a period of two years in his practice he had specialized in insurance law. He admitted that he first saw Mrs. Udstone on April 23d, and on that date she stated the injury had occurred some time before. He stated that Mrs. Udstone authorized him and retained him to obtain a recovery. He admitted that he went to see Mrs. Boggs and asked her whether or not she had insurance, and admitted making two phone calls at that time concerning which she had testified. He admitted also taking the insurance policy from her shop to his office. He further admitted various transactions that he had with Mr. Austin and stated further that he told Dr. Kameny to change the date on his medical report, but stated he had done this merely as a favor to Mrs. Boggs. He admitted that when he was taken up to his building, following his arrest, he had lied to the deputy district attorney he met outside when he stated he had no file on the case. He admitted writing the letter of May 26th, wherein he stated that it occurred on May 21st, but attempted to excuse his conduct by stating he did so as a favor to Mrs. Boggs; that this was not a false statement, it was simply a "mistake". He admitted he made this false statement knowingly but that he did not intend to do any harm to anyone. He admitted that he had told Mrs. Boggs he would induce Dr. Kameny to change the date on his medical report. He stated that Mrs. Boggs had told him that she had some difficulty in getting a certificate of insurance issued and stated she told him she had insurance at a former location; that she had some difficulty in getting the insurance transferred to cover the Central Beauty Shop and that for some reason, not clearly explained, she desired the date fixed as of May 21st because of this alleged trouble over her insurance. He testified that he was sure Mrs. Boggs had an insurance policy which was in effect prior to the effective date of the policy under which he made this claim. He said he thought this latter policy was merely a continuation of the old one. He

stated he knew the date of the Udstone claim was to be changed but he did not think it was important to see the old policy. He stated that Mrs. Boggs requested him to send the letter of May 26th in spite of the fact that in the course of the phone conversation between himself and Mrs. Boggs when she phoned from the district attorney's office, the phone conversation that was reported in full and read into evidence, he requested and directed her to send this letter to her insurance company. Dr. Kameny testified he first saw Mrs. Udstone on April 22d. He testified she came to him as a member of an insurance association and that under the rules of the association if she recovered damages as a result of her injury, he would be entitled to a doctor's fee. This was apparently stated by Dr. Kameny in order to explain his submission of a bill for $50 to Mr. Austin. He frankly admitted changing and falsifying the medical report and stated he did not think that was wrong. He made the following damaging admission under cross-examination: ''Q. This is exactly what you did here, you made a false statement here for the purpose of enabling your friend, Mr. Grossman, to collect money from an insurance company, didn't you? A. I did not know there was anything wrong in it. Q. You did that though, did you? A. I did it because he said, he told me it was all right to do it.'' In rebuttal Mr. Harry C. Smith, who was an officer of the company in which Mrs. Udstone was insured, testified that Dr. Kameny was never authorized to make any charge to anyone for medical services rendered a member of the association. In rebuttal Mrs. Boggs testified that she never at any time told defendant she was insured and denied that she ever asked or requested defendant to falsify the date of the alleged accident. She further denied she ever had any difficulty in transferring her insurance policy from the former location to the Central Beauty Shop and stated not only did that never occur, but she had never stated anything to that effect to defendant. On the contrary she testified positively she told defendant she had no insurance whatever.

The defendant seems to contend that prosecution was bound to show that the contract of insurance alleged in counts three, four, five and six, imposed liability upon the insurer. The first answer is the prosecution made that showing. The second answer is that the gravamen of the offense

alleged was the defendant's intent to defraud. That intent did not depend solely on the legal obligation, if any, arising out of the said contract. (*People* v. *Morley,* 8 Cal. App. 372 [97 Pac. 84], and cases there cited.)

In connection with the point just stated the defendant contends there was no evidence that a valid contract of insurance existed after April 27, 1937. We think he is in error. No frailty is shown by him. The policy put in the hands of Mrs. Boggs was regular in form. Defendant shows nothing to the contrary. The underwriters through their duly appointed representative, Mr. Toso, testified it was a valid subsisting contract.

Again, defendant contends, there was no evidence that a claim was made within the provisions of sections 556a and 556b of the Insurance Code. But the defendant's letter was not disputed in any respect, and it was clearly evidence of a claim. The defendant argues that it did not constitute proof of loss. It was not necessary it should. A written claim and proof of loss are seldom embodied in one and the same document. As Mrs. Udstone claimed to have been injured by Mrs. Boggs, the letter was addressed to the latter. As Mrs. Boggs was supposed to collect from her insurance carrier, the letter was by her forwarded to the insurance company and thus served as a notice of claim first against Mrs. Boggs and secondly against the said company. As to the contents of the letter we fail to see in what respect it did not fully comply with the calls of both sections 556a and 556b of the Insurance Code.

The several counts hereinabove mentioned were all pleaded in one indictment pursuant to the provisions of section 954 of the Penal Code. The defendant claims said statute is unconstitutional. He claims it is violative of the Fourteenth Amendment to the Constitution of the United States. He cites no authority supporting that claim. *People* v. *Kelly,* 203 Cal. 128 [263 Pac. 226], and *In re Culver,* 84 Cal. App. 295 [257 Pac. 876], each hold that section 954 is not invalid. The latter case holds it is not vulnerable to the attack the defendant makes.

The defendant claims he was entrapped. (*Sorrells* v. *United States,* 287 U. S. 435 [53 Sup. Ct. 210, 77 L. Ed. 413, 86 A. L. R. 249].) A comparison of the facts in the

instant case with the facts in the case just cited, shows the rule in the cited case may not be applied in the instant case. There is an absence of evidence that any persuasion or inducement was offered to defendant to do what he did. Therefore there was no entrapment. (*People* v. *Makovsky*, 3 Cal. (2d) 366, 370 [44 Pac. (2d) 536].)

■ The defendant also contends it was necessary for the prosecution to prove, under the counts pleading attempts to obtain money by false pretenses, that the victim relied upon the alleged false pretenses. But the law is well settled to the contrary. (*Comm.* v. *Johnson*, 312 Pa. 140 [167 Atl. 344, 89 A. L. R. 333, 335], and extended note commencing on page 342; *People* v. *Arberry*, 13 Cal. App. 749 [114 Pac. 411] ; *People* v. *Harper*, 17 Cal. App. (2d) 446 [62 Pac. (2d) 390].)

■ When the prosecution closed its case the defendant made a motion that the jury be directed to bring in a verdict for the defendants. The motion was denied and the defendant assigns that ruling as prejudicial error. He concedes that technically the motion was not properly worded, and that the motion should have been to advise the jury. (Pen. Code, sec. 1118.) Be that as it may, the motion was properly denied because the record shows the prosecution had produced an abundance of evidence and it could not be said that, if the cause had then been submitted, the evidence was "insufficient to warrant a conviction". ■ The defendant specially presses the point as to the counts pleading a conspiracy. He claims there was no evidence of "an agreement", etc. If he means direct evidence he is correct. But there was plenty of indirect evidence of facts occurring during the life of the conspiracy which warranted the court in holding, in effect, that there was not a failure of proof as to "an agreement". (*People* v. *George*, 74 Cal. App. 440 [241 Pac. 97].)

■ The defendant complains because the trial court did not give a certain instruction. The vice in the complaint is that it is not supported by the record. The facts were as follows: After the jury had retired to deliberate it returned into court. Certain proceedings (the re-reading of instructions, etc.) were had. Then: "The Court: Anything further, ladies and gentlemen? The foreman: Could we ask if

during the life of that policy a claim could have been paid under that policy or that contract of insurance? The Court: Is it stipulated, gentlemen, that during the life of the policy a claim could be made for insurance money? Mr. Sullivan: No. Mr. Pierce: Positively not. That is the very issue in this case. Mr. Coakley: No use arguing the case now. I certainly want to be heard on that. Mr. Sullivan: We are not arguing. The Court asked for a stipulation and we say we cannot. That is one of the points at issue. The Court: Very well. You may retire for further deliberation." In the foregoing colloquy we find no request for an instruction, and in particular, no such request by the defendants.

 The contention is also made that the trial court failed to instruct the jury that the testimony of an accomplice must be corroborated. It is a sufficient answer to state that the defendants did not ask for an instruction on that subject. However, there was corroboration in the evidence introduced and the omission of an instruction worked no injury to the defendant.

 Finally the defendant contends the district attorney was guilty of misconduct. The contention is based on these facts: Mrs. Udstone sued Mrs. Boggs. The latter appeared and answered. In the instant case Mrs. Boggs was called as a witness by the prosecution. On cross-examination the original file in *Udstone* v. *Boggs* was produced and offered in evidence. On redirect examination her answer in said suit was shown her and the proceedings were as follows: "The Court: . . . You signed the Answer did you, you read and signed the Answer. It was read by you and you signed it, did you? A. Yes. Mr. Coakley: All right. Now, then, you did so under his advice and direction, is that correct? Mr. Pierce: Object to that, your Honor, calling for her opinion and conclusion, and hearsay. Mr. Sullivan: Also self-serving. Mr. Coakley: It stands to reason she did so; what's the use of quibbling? Mr. Pierce: Assign the remark of the district attorney as misconduct and ask the jury be directed not to consider it. The Court: Your remark is improper, Mr. Coakley, and may be stricken out and the jury directed not to consider it." The record thus shows the slight error of the

deputy district attorney was completely cured by the clear and decisive admonition of the trial court.

The judgment and order are affirmed.

Nourse, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 6, 1938, and an application by appellant to have the cause heard in the Supreme Court after judgment in the District Court of Appeal, was denied by the Supreme Court on September 20, 1938.