[Crim. No. 7318.    Second Dist., Div. One.    Mar. 21, 1961.]

THE PEOPLE, Appellant, v. JOHN T. REED et al.,
Respondents.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Appellant.

Dan Busby and Joseph Fitzpatrick for Respondents.

WOOD, P. J.—In count 1 of an amended information the defendants John T. Reed, Anna Reed, and Chuck Adams were accused of the crime of conspiracy to commit grand theft and violate section 556 of the Insurance Code in violation of section 182, subdivision 1, of the Penal Code. It was also alleged, in count 1, that the defendants on or about March 30, 1960, in Los Angeles County, did unlawfully conspire together to commit grand theft and to present to the National Union Insurance Company, a corporation, a false and fraudulent claim for the payment of a loss under a contract of insurance and did subscribe to a writing with intent to present and use the same in support of such false and fraudulent claim, in violation of section 556 of the Insurance Code. It was also alleged, in count 1, that pursuant to the conspiracy, the defendants committed overt acts in Los Angeles County in that on April 1, 1960, each defendant spoke to Donald V. Batman and signed a statement regarding the collision and injuries.

In count 2 of the amended information the defendants were accused of attempted grand theft in violation of section 487, subdivision 1, and section 665 of the Penal Code. It was also alleged therein that the defendants on or about April 7, 1960, in Los Angeles County did unlawfully attempt to take $500, the property of the National Union Insurance Company.

In count 3 of the amended information the defendants were accused of violating section 556 of the Insurance Code. It was

alleged therein that defendants on or about April 1, 1960, did unlawfully present to the National Union Insurance Company a false and fraudulent claim for the payment of a loss under a contract of insurance and did subscribe to a writing with intent to present the same in support of such false and fraudulent claim.

Defendants' motion, under section 995 of the Penal Code, to set aside the amended information was granted. The People appeal from the order granting that motion.

Section 995 of the Penal Code provides, in part, that an information must be set aside by the court, upon defendant's motion, if the defendant has been committed without reasonable or probable cause.

The question is whether the preliminary examination transcript and the exhibits show reasonable or probable cause for issuance of the commitment. There were 57 exhibits—26 offered by the People, and 31 by the defendants. On several of the People's exhibits, such as checks, releases, accident reports, and written demands, there were signatures.

The clerk's transcript contains a digest of the testimony as shown by the transcript of the preliminary examination. That digest, which was prepared by the district attorney, is not questioned by respondents (defendants) and it will be regarded as a statement of the substance of the testimony at the preliminary examination. That digest is as follows:

"LAWRENCE W. SLOAN, (Page 3), stipulated to be an expert in comparison of questioned documents, testified that it was his opinion that all documents bearing the signature Chuck Adams were signed by one and the same person. He further testified that all documents bearing the signature of John Wayne, Five Wayne, Jive Wayne, John Best, and John Reed, (as appearing in Exhibits 11 and 12) were signed by one and the same person and that it is his qualified opinion that that same John Reed also signed the name Roy Moreno (Exhibits 16 and 17). He further testified that the person printing the name Anna Reed (Exhibits 5 and 9) was one person.

"ROBERT BRISSENDEN, (Page 162), Fireman's Fund Insurance adjustor, testified to the first accident which occurred January 24, 1958, in Los Angeles County. The insured vehicle was driven by Michael May. The Gypsy driver was George Uwanawich. The persons claiming injuries were John Reed, the defendant, under his own name and George Uwanawich. No payment was made. The adjustor did not believe any injury had occurred. A Proof of Loss was signed by George

Uwanawich. The representation of the injury was that John Reed injured his left arm, knee and the rear end of his vehicle.

"JAMES K. NEMEC, (Page 190), an adjustor with the Automobile Club of Southern California, testified to the second accident, being on February 14, 1958, in Los Angeles. The insured vehicle was driven by an attorney named Charlotte Farnham. The Gypsy driver was Chuck Adams, claiming injury under his own name and was paid $400. He stated in the representation that the woman driver, who was insured, backed up when the light changed. Chuck Adams signed check and a release form.

"WALTER WILLIAMS, (Page 22), an adjustor with the California State Automobile Association, testified to the next accident, being July 6, 1958, in San Francisco. The insured driver's name was John H. Bond and was insured by the California State Automobile Association. The Gypsy driver was Chuck Adams. The injuries complained of were to Chuck Adams and his child, John Reed, Anna Reed and their child Steven Reed. The claimants for injury were all three defendants, Chuck Adams, John Reed and Anna Reed. Payment was made of $500 to Chuck Adams and his family, including his children Robert and Rose, and $550 to John Reed and $150 to his son Steven. All three defendants signed statements under oath. Anna Reed printed her own name Anna Reed on the statement, although on other forms she used an 'X.' The representations were that they were rear-ended by the insured driver; that they suffered whiplashes and injury to the chest.

"J. W. VAN DOREN, (Page 101), an independent adjustor, testified to the next accident, August 4, 1958, at Klamath Falls, Oregon. The insured driver's name was John S. Kunze of the Oregon Auto Insurance Company. The Gypsy driver's name was, at that time, Jimmy Moreno. The injured was Roy Moreno, which in fact is defendant John Reed. The injured party was photographed and Roy Moreno is, in fact, the defendant John Reed. Payment was made for $1,003.97 to Roy Moreno (John Reed). The representations were that they were rear-ended by a truck; that they never had any prior injury, prior accidents, nor any prior claim of collection from any insurance company. This representation was notarized and sworn to by Roy Moreno, who, in fact, is John Reed.

"GEORGE BETTGE, (Page 136), an independent adjustor, testified to an accident September 9, 1958, in Los Angeles. The insured driver was Donald Naucshultz. The insurance company was Employer's Mutual. The Gypsy driver's name was

John Best, who is John Reed. The injured parties claimed that they were John Best, known as John Reed, Mary Best, known as Anna Reed, and Chuck Adams. No money was paid. Statements were made by John Best, now known as John Reed, and Chuck Adams. The representation by John Reed was that he never had any prior injury, accidents or claim, and that he also injured his neck and back in an accident when he was 14 years old.

"PATRICK J. FITZGIBBONS, (Page 74), an adjustor for R. L. Gresham and Company, testified to an accident on March 10, 1959, in Las Vegas, Nevada. The insured driver was Arthur Ariolla. The carrier was All State Insurance Company. The Gypsy driver was Five Wayne, who is John Reed, the defendant. The injured parties claimed were Five Wayne and Mary Wayne who is Anna Reed, and the children. Payment was made. Six hundred sixty-eight dollars and sixty-six cents was paid to Five Wayne and $225 was paid to the children. Five Wayne signed by that name and Anna Reed signed an 'X' in a proof of loss statement. The representation was that they were rear-ended by a truck.

"DONALD V. BATMAN, (Page 215), an independent adjustor, testified that the accident occurred on March 30, 1960, in Palm Springs, California. The insured company was the Palm Springs Tire Company and the carrier was the National Union Insurance Company. The Gypsy driver was John T. Reed. The injured parties were John T. Reed, Anna Reed, and Chuck Adams. A demand was made for $500 each, but no payment was made. A one hundred dollar bribe was offered to this witness to expedite the claim by defendant John T. Reed. All three signed releases and statements. All three signed statements to the effect that they were rear-ended by a truck; that none of them had any prior injuries; that none had claimed any accidents from any other insurance company before and none had been involved in traffic accidents before. Reed complained of whiplash and back injuries. Anna Reed complained that she had whiplash, back injuries, was two months pregnant and Adams complained of injuries to his chest. The representations were notarized to the adjustor.

"NOTE: Each insurance adjustor to whom representations were made that there had been no prior accidents, injuries or claims, stated that they relied upon the representations as material in their determination of liability and damage."

One of the charges against defendants was attempted grand theft allegedly committed on April 7, 1960 (count 2). At the

preliminary examination Mr. Batman testified as follows: He was an insurance adjuster employed by Brown Brothers, adjusters, in Los Angeles. The three defendants came into his office in Los Angeles on April 1, 1960, and presented a claim for damages for personal injuries resulting from an automobile accident in Palm Springs on March 30 or 31, 1960. Defendant John Reed did most of the talking while defendants were in the office. Defendants said that John Reed was the driver of defendants' automobile, and that the other vehicle involved in the accident was a Dodge truck. The truck was owned by the Palm Springs Tire Company, and that company was insured by the National Union Insurance Company which he (witness) represented as an insurance adjuster. Defendants said that they were going to make a left turn and they slowed down, and a truck which was "following pretty closely behind them" collided with the rear end of their car, and all of those in the car were injured. Those in the car were John Reed, Anna Reed, Chuck Adams, and two sons of the Reeds. Anna said that she was pregnant, and that as a result of the accident she had pains in her abdomen. John complained of a sore back. Chuck said his chest was injured. The Reeds said that, as a result of the accident, one of the sons had a bruise on his temple and the other one was "hurting." Each defendant said that he or she had never been involved in any prior accident and that he or she had never presented any claim to any insurance company before. Those representations that they had never been in any prior accident and had never presented any claim to an insurance company were material representations. Those representations were material because persons who have had injuries in the past are likely to have some aggravation of a preexisting condition and "this is the prime importance in securing information as to past accidents, plus the fact of determining whether or not they had a legitimate claim in the past." All of the defendants said "they had never been known by other names." At first the defendants asked for a total of $1,600. John Reed said that if the witness (Mr. Batman) would settle the claim for $1,600, he (Reed) would let the witness have $100 for himself. The witness did not accept the offer. Finally the defendants asked for $500 for each of the three adults. Chuck Adams signed Exhibit 10 in the presence of the witness on April 1, 1960. (That exhibit is a "Report of Accident" signed by Chuck Adams.) Before the report was signed, the witness asked Adams if he had had prior accidents or had made any prior insurance claims. He

answered, "None." Also before the report was signed, the witness asked Adams if he had been known by any other names. He answered, "No." The witness wrote those answers on the report. John Reed signed Exhibit 11 in the presence of the witness on April 1, 1960. (That exhibit is a "Report of Accident" signed by John F. Reed.) At the time the witness wrote that document (Exhibit 11) he asked John Reed to describe his prior accidents and prior claims. Reed answered, "None." The witness also asked John Reed whether he had ever been known by another name. He answered, "No." The witness saw Anna Reed place her mark "X" on Exhibit 12. (That exhibit is a "Report of Accident" on which there is a signature consisting of an "X," and also a signature of John F. Reed, as a witness to the mark, which signature is written above the words, "I have read this to my wife.") Before Anna Reed placed her mark on the report, John Reed picked up the report, turned toward Anna, and appeared to be reading the report to her. While John apparently was reading the report to her, the word sounds were not "in the English language." After he concluded the reading, Anna signed the report "with the X." Then John Reed wrote at the bottom of page 2 of the report the words, "I have read this to my wife." He also signed, at that place, a name which appears to be "John T. Reed." The witness told the defendants that it would probably be Tuesday or Wednesday (April 6 or 7) before they would receive their drafts. On April 7 Anna Reed and Chuck Adams came to the witness' office to get the drafts. The witness asked Anna where her husband was, and she replied that he had taken the children to a doctor. The witness said that he wanted signed receipts for the drafts and he wanted the husband to be there because he (witness) had to have the husband's signature, and "of course you [Anna] cannot read or write." She replied, "Well, I can print my name." The witness said that he preferred to have her husband sign the receipt. She said, "Well, we cannot find him now." He (witness) asked Adams if he would sign the release for the amount of $450. Adams signed the release. Then the conversation ended, and the defendants were arrested. No payment was made on the claim because they (the adjusters) realized that probably the claim was not valid.

▮▮▮▮ It thus appears that the defendants in presenting their claims on April 1, 1960, with reference to the alleged Palm Springs accident (which claims are referred to in the amended information), stated orally and in writing that they

had not been involved in any prior accident and had not presented any prior claim to any insurance company.

The evidence received at the preliminary examination also shows that during a period of approximately two years preceding the time the defendants made their claims on April 1, 1960, the defendant John Reed had made five prior claims against insurance companies for damages allegedly resulting from rear-end automobile collisions; that Anna Reed had made three such prior claims; that Chuck Adams had made three such prior claims; that some of those claims included amounts claimed on behalf of the Reed children and the Adams children; that substantial amounts of money had been paid to defendants on some of those prior claims; that those claims were made in various cities which were far apart, and the claims of the Reeds were made under several different names.

Stated more specifically as to when and where prior accidents occurred and claims were made and paid, the evidence shows: John Reed was in an accident in Los Angeles in January 1958—no payment. Adams was in an accident in Los Angeles in February 1958—was paid $400. The Reeds and one of their children, and Chuck Adams and two of his children, were in an accident in San Francisco in July 1958— they were paid $1,200. John Reed was in an accident in Klamath Falls, Oregon, in August 1958—he used the name of Roy Moreno and was paid $1,003.97. The Reeds and Chuck Adams were in an accident in Los Angeles in September 1958—Reeds used the names of John Best and Mary Best—no payment. The Reeds and their children were in an accident in Las Vegas, Nevada, in March 1959—they used names of Five Wayne and Mary Wayne—and were paid $1,068.66.

It thus appears that the evidence at the preliminary examination established that each defendant, in presenting his or her claim on April 1, 1960, to the insurance company (regarding the alleged Palm Springs accident) made false and fraudulent statements that he or she had not been involved in any prior accident and had not presented any prior claim to any insurance company. The several prior accidents allegedly involved substantial personal injuries and had occurred at frequent intervals within a short period of time (about 13 months—from January 24, 1958, to March 10, 1959). All the prior accidents involved rear-end automobile collisions—usually it was a truck that struck the rear end of the automobile in which defendants were riding. Some of

the collisions allegedly occurred when claimants' automobile was occupied by several members of the Reed and Adams families—with the alleged result that several persons were injured in an accident. Under the circumstances it is unreasonable to conclude that the defendants, in presenting their claims on April 1, 1960, inadvertently or excusably overlooked all or any of the prior allegedly serious accidents and injuries. Those representations with reference to having had no prior accidents or injuries and having made no prior claims were material representations which had a direct bearing on the decision of the insurer as to the bona fides of the claims and as to whether the insurer should deliver money to defendants in settlement of their claims. The insurance adjuster, to whom the defendants presented their claims regarding the Palm Springs accident (the claims directly involved here), testified, as above shown, that such representations were material. Also, several other adjusters testified that such representations were material in evaluating insurance claims. The materiality of such representations in a charge of attempted grand theft is discussed in *People* v. *Burnett,* 21 Cal.App.2d 613 [69 P.2d 1028]. In that case it was said at page 618: ''The gravamen of the offense charged in the instant case [attempted grand theft] is that defendants knowingly and designedly attempted to defraud the Massachusetts Bonding and Insurance Company by means of false or fraudulent representations or pretenses. . . . In addition to the direct claim of injury to Mrs. Burnett in her fall, defendants also made the following representations: That Mrs. Burnett had never suffered an accident before and that she had never before made any claim for any injuries suffered by her. It seems evident that these representations were of material facts germane to the inquiry into the justness of the claim of Mrs. Burnett for compensation for her purported injuries. If these representations had been accepted by the insurance carrier as true, it might have followed that a less vigorous investigation of the purported accident would have been made. It might be concluded that defendants, as a voucher of good faith on their part, made these representations with the desire to conceal any former claim of damages for injuries having been made by Mrs. Burnett. It must be conceded as true, that these representations were falsely made with the intention of concealing the fact that defendants had participated in a prior fraudulent claim made to secure compensation from an insurance carrier. If, as we believe, these

representations were of material facts, then the People could prove their falsity as a part of the case in chief for they were part of the false or fraudulent representations or pretenses whereby defendants attempted to defraud the insurance carrier.'' In the present case it could be inferred from the evidence that defendants were seeking a speedy settlement. Their claims were presented on the second day after the alleged collision, and John Reed offered to allow the adjuster to retain $100 for himself if he would settle the claim for $1,600. It is reasonably certain that defendants knew that their plan for a speedy settlement or any settlement would fail if they disclosed the facts that they had had several similar prior accidents and had presented damage claims therefor. ■ ''It is well established that intent [to defraud] may be proven by proof of the surrounding circumstances.'' (*People* v. *Turley,* 119 Cal.App.2d 632, 635 [259 P.2d 724].) Guilty knowledge may be inferred from the facts proved. (*People* v. *Engelhart,* 78 Cal.App.2d 6 [176 P.2d 789].) ■ Upon the charge of attempted grand theft in count 2 herein, it is not a necessary element of the offense that the intended victim be actually deceived. (See *People* v. *Camodeca,* 52 Cal.2d 142 [338 P.2d 903].) In *People* v. *Grossman,* 28 Cal.App.2d 193, it was said at page 204 [82 P.2d 76] : ''The defendant also contends it was necessary for the prosecution to prove, under the counts pleading attempts to obtain money by false pretenses, that the victim relied upon the alleged false pretenses. But the law is well settled to the contrary.'' ■ On a motion to set aside an information under section 995 of the Penal Code, the ''court is only to determine whether the magistrate, acting as a man of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated.'' (*People* v. *Jablon,* 153 Cal.App.2d 456, 459 [314 P.2d 824].) ■ In the present case, as above indicated, the evidence was sufficient to cause a committing magistrate to believe that the defendants, in presenting their claims on April 1, 1960, to the insurance company, made false and fraudulent statements that they had not been involved in any prior accident and had not presented any prior claim to any insurance company; and to believe that those statements were deliberate and intentional false pretenses by which the defendants attempted to commit grand theft by unlawfully attempting to take $500 from the insurance com-

pany. Count 2 of the information should not have been set aside.

■ As above stated, count 1 charged conspiracy to commit grand theft and to present to an insurance company a false and fraudulent claim and that they did subscribe to a writing with intent to use it in support of such false and fraudulent claim, in violation of section 556 of the Insurance Code. That section provides: "It is unlawful to: (a) Present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance. (b) Prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented or used in support of any such claim. . . ." Respondents (defendants) argue, as above indicated, to the effect that the corpus delicti was not established in that (1) there was no evidence that the automobile accident, referred to in the amended information, did not occur; (2) there was no evidence the other accidents did not occur; and (3) there was "no evidence to establish a false claim to an insurance company." It seems that defendants' position is that there was lack of probable cause for issuing the amended information in that there was no evidence that the defendants were not injured as claimed by them as a result of an accident. Stated in another way, it seems that defendants' position is that the claims of defendants were not false or fraudulent claims within the meaning of the provisions of section 556 of the Insurance Code. They seem to argue further that the evidence shows there was a genuine accident and that since there was such an accident, any incorrect information stated in the claim would not make the claim a false or fraudulent claim.

The statements made hereinabove (in discussing count 2), relative to the intentionally false and fraudulent statements of defendants, are applicable here. Those statements of defendants were a material part of the claim and, under the evidence showing that defendants deliberately made the same false and fraudulent statements in several prior accident claims, the committing magistrate might reasonably conclude that since the claims herein were so flagrantly false and fraudulent in such a material and major part of the claim, the claim was false and fraudulent in other respects including the manner in which the accident happened and the alleged resulting injuries. In other words, the committing magistrate could reasonably conclude that the defendants entered into a conspiracy to present a false and fraudulent claim within the

meaning of section 556 of the Insurance Code. Conspiracy may be inferred from circumstances. The committing magistrate could reasonably conclude that defendants had entered into conspiracy as alleged in count 1.

As above stated, count 3 charged violation of section 556 of the Insurance Code. The statements made hereinabove relative to counts 2 and 1 are applicable here. A committing magistrate could reasonably conclude that defendants violated said section as alleged in count 3.

The order setting aside the amended information is reversed.

Fourt, J., and Lillie, J., concurred.