[Crim. No. 19776. First Dist., Div. Two. Sept. 3, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
GENNARO A. DE CARO, Defendant and Appellant.

[Crim. No. 19789. First Dist., Div. Two. Sept. 3, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
MANFRED ROTHBRUST et al., Defendants and Appellants.

**COUNSEL**

James E. Leininger, William B. Gordon, Harry J. Delizonna and Jon S. Fox for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, John B. Moy and Nathan D. Mihara, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TAYLOR, P. J.**—In these consolidated matters, the codefendants, G. A. De Caro and Manfred and Anitaka Rothbrust, appeal[1] from orders suspending sentences and granting probation after each entered nolo pleas as set forth below,[2] to a charge of presenting a false insurance claim (former Ins. Code, § 556, subd. (a)). De Caro and Rothbrusts contend on appeal that their motion to suppress should have been granted as: 1) the entry of Kollinzas into the De Caro home by a ruse was unlawful and violated De Caros' reasonable expectations of privacy; 2) without the observations made by Kollinzas, there was no probable cause for the issuance of the search warrant for the De Caro home. For the reasons set forth below, we have concluded that since

---

[1]De Caro's notice of appeal erroneously indicates that it is taken from the judgment of conviction; we construe his notice as properly taken from the order suspending sentence.

[2]De Caro pled nolo contendere to one count of presenting a false insurance claim (former Ins. Code, § 556, subd. (a)); the Rothbrusts pled nolo contendere to three counts of presenting false insurance claims and one count of conspiracy (Pen. Code, § 182).

there was sufficient probable cause for the issuance of the search warrant for the De Caro residence, the orders must be affirmed.

The record reveals the following pertinent facts:

At 2 a.m., on November 30, 1974, the Rothbrusts reported to the San Jose police a burglary at their home on Clovis Avenue. The stolen items included: two 17-inch color television sets, a Sharp 17-inch microwave oven, a Nikkormat camera with its case and several lenses, a Century Mark binocular, cassette, recorder and several lenses, a man's Bulova quartz white gold wristwatch, two Panasonic AM-FM radios, a Royal electric typewriter, and three Polaroid XL-70 cameras with accessories. In December 1974, Hartford Insurance paid the Rothbrusts $6,002.91 in settlement of their original claims for $8,441.73.

On November 15, 1975, the Rothbrusts reported to the San Jose police a burglary from their truck while parked at the Valley Fair Shopping Center. The items taken included a 17-inch Sony woodgrain color television, a General Electric microwave oven, a Sony portable radio and tape recorder, a Nikon-type camera (serial No.7624155) and lens. Hartford Insurance paid the Rothbrusts $1,866.84 for this loss and subsequently cancelled the insurance.

On February 7, 1976, Mrs. Rothbrust reported that her purse had been snatched; it contained her driver's license, $20 in currency, and about $928 worth of jewelry. Chubb-Pacific paid $521.50 for this loss.

On July 17, 1976, the Rothbrusts reported another burglary at their home. The property taken included: a Sansui turntable, receiver and tape cassette; a platter; a silver coffee set; silver for eight; a Johnson CB radio; a home base station; an Omega Seamaster chronometer; an one-fourth carat diamond ring; a Nikon motor drive and an Olympic coin collection. Chubb-Pacific paid the Rothbrusts $2,571.43 on this claim.

On November 14, 1976, De Caro, a San Jose police officer, reported a burglary at his residence at 1853 Blossom Hill Road in San Jose. The 27 missing items included: a Polaroid 360 camera; a Superscope cassette recorder; a .38 Colt Special Cobra; a 19-inch color Sony television; a Panasonic portable radio (model No. RF 388); a Sansui receiver (QRX 7001), a Sansui turntable (SR-3080) and cassette recorder (SC-3000); 2 Jensen speakers (model 6); Heil speakers (AMT 18); headphones; a Sony Beta Max and timer; Sony videotape; a locked gray

metal cash box; a men's Rolex GMT master watch; a Nikkormat camera and lens; $300 in cash; 1 man's gold ring with 1/2 carat diamond; an electric typewriter; a microwave oven; a sterling silver service for 10; and checkbooks with cancelled checks for 1975-1976. Select Insurance paid De Caro $8,544 of his claim of $12,000 on his homeowners policy.

On December 26, 1976, Mrs. Rothbrust reported a third burglary of their home. The stolen items included: a Litton microwave oven; a Beta Max audiotape unit; a 12-inch GM portable color television; a 19-inch Sony color television. Chubb-Pacific paid Mrs. Rothbrust $3,301.01 for the above loss and paid an additional $413 to a glass company for repairs.

On March 24, 1977, the Rothbrusts reported a fourth burglary of their home. The stolen items included: a pickup truck with camper shell; a tool box containing brickmason's tools; two Johnson CB radios and microphones; a Tennelec police scanner; a Singer Athena sewing machine (model 2000) in a brown case; a Montgomery Ward one-inch power drill and brown belt sander; a Skil brand worm drive saw; a Black and Decker brand router; a Powercraft wrench set and drive set; a Blaupunkt AM/FM radio and cassette player (model CH 4090) and a case of 32 cans of Astroshield auto polish. Farmers Insurance settled the claim with the Rothbrusts.

In May 1977, in response to an anonymous letter, the San Jose Police Department began an investigation. Sergeant McCready ascertained that: 1) contrary to the information on the insurance claim form, De Caro could not prove that he had purchased the items at the time and place indicated; 2) McCready also could not verify many of the De Caro purchases and the amounts; 3) De Caro had listed a number of items at greatly inflated (25 percent) prices; and 4) De Caro had reported purchases that could not be verified because the stores listed never carried the item, or listed items that did not exist.[3] McCready also discovered that the serial number on the stolen .38 was wrong. McCready found it strange that De Caro made no attempt to follow up on the status of his burglary, despite the loss of his weapon and the size of the loss.

---

[3]For example, De Caro indicated that he purchased Jensen Model 6 speakers; the sales slip showed Jensen Model 15 speakers; Breuner's had no record of De Caro's purchase of a 19-inch color television set in 1975; Dahnken's store never handled the Heil ESS speakers that De Caro claimed had been purchased there. No lens manufacturer made a 135 mm. F-2.6 as reported by De Caro.

From J. W. Connell,[4] De Caro's insurance adjuster, McCready learned that: 1) De Caro had purchased the Sansui receiver, turntable and cassette recorder from Mr. Robertson at 1665 Clovis Avenue; 2) Mr. Robertson had done some repair work on the De Caro residence on a separate property damage claim. McCready ascertained that 1665 Clovis did not exist, and that Robertson was Rothbrust. Further, the M & R Construction Company that had done the repair work on the De Caro home was owned by Rothbrust, who resided at 1659 Clovis. The Rothbrusts and the De Caros were friends.

McCready then investigated the Rothbrusts and learned of the five burglary and theft reports detailed above. McCready compared the Rothbrust and De Caro property loss lists and noticed a strong similarity: 19 of 27 items were similar as to make and manufacturer, and 7 were identical.

On June 13, 1977, at the request of Mrs. Rothbrust, McCready visited the Rothbrust home to help them with a burglary investigation and insurance claim. At the Rothbrust home, McCready saw several items that matched 7 of the 27 items that had been reported stolen from the De Caro residence, as well as items previously reported stolen by the Rothbrusts in 1975 and 1976, namely: 1) a Sansui receiver (model QRX-7001) and 2) turntable (SR-3080); 3) a 19-inch Sony portable color television set; 4) a Panasonic portable radio; 5) a Sony Beta Max video with a digital timer; and 6) a Sony AM/FM radio cassette. The Sansui receiver QRX-7001 appeared by make and model number on De Caro's list, and by make on the Rothbrusts' report of July 17, 1976. The Sansui turntable also appeared in De Caro's report by make and model number and by make on the Rothbrusts' July 17, 1976, report. The 19-inch portable Sony color television set model KCV-1941R appeared in De Caro's report and on Rothbrusts' report of December 26, 1976, by make and model number. The Panasonic portable model No. RF-388 appeared in De Caro's report and the Rothbrusts' report of November 30, 1974. The Sony Beta Max and its digital timer appeared in De Caro's report and the Rothbrusts' December 26, 1976, report.

McCready also ascertained that the Rothbrusts were receiving replacements in kind or money from more than one insurance carrier for the same items reported as stolen. Given the similarity and identity of

---

[4]At the probable cause hearing, Connell testified that De Caro told him that the items purchased from "Robertson" were stolen.

items, McCready believed that the Rothbrusts had given some of the replaced property items to De Caro. Also, De Caro's burglary report appeared "too ... canned."

Late in May of 1977, McCready asked for the assistance of Constantine Kollinzas, an investigator for the Insurance Crime Protection Institute. Kollinzas then provided McCready with the copies of the claims filed by the Rothbrusts and paid by several of the insurance companies as to the losses described above.

In June 1977, McCready, who knew that the De Caro home was for sale, asked Kollinzas to go to the De Caro home by posing as a prospective buyer and check whether any of the stolen or missing items were there. McCready instructed Kollinzas to visit the De Caro home with a licensed real estate agent and to take a routine walk through the home and observe only what was in plain view. Kollinzas received a list of the items and memorized it. McCready cautioned Kollinzas not to disturb anything and not to look in any closets or drawers.

On June 20, 1977, Kollinzas arranged the visit with Michael Balalis, a broker with whom Kollinzas had dealt once before. Balalis did not know about the investigation and believed that Kollinzas was a bona fide potential purchaser. Balalis testified that if he had been aware of the true purpose of Kollinzas' visit, he would not have made it possible.

Balalis called De Caro's broker and learned that the De Caro home had been listed with the multiple listing service. By doing so, De Caro authorized the use of a "lock box" containing his residence key, to which only certain brokers had access.

Balalis and Kollinzas drove to the De Caro home and saw a "for sale" sign in the yard. After Balalis knocked on the front door and received no answer, he opened the lock box and obtained the front door key. He unlocked the front door and entered, shouting "Real estate, real estate." No one responded. Balalis and Kollinzas then walked from the entry hall through the living room, into the kitchen, and downstairs to the recreation room. There, Kollinzas noticed two Jensen speakers from the memorized police list. Kollinzas followed McCready's instructions and did not open any closets or drawers; he took no notes. After a brief look at the washroom and garage, Kollinzas took a second look at the recreation room. The entire visit lasted between 5-10 minutes.

The same afternoon, Kollinzas reported to McCready that in addition to the two Jensen speakers, he saw the following items that were similar to the items reported stolen by De Caro on November 14, 1976: a Sansui receiver and cassette recorder; Heil ESS speakers and a 19-inch portable Sony television set.

On July 15, 1977, after a probable cause hearing, the superior court issued search warrants for the De Caro home and his police locker. The warrants were supported by the sworn testimony of Kollinzas and McCready and numerous additional police reports and other investigative documents. McCready and other San Jose police officers executed the warrant for the De Caro home about 6 p.m. and seized the following items: a Sansui receiver, turntable and cassette recorder; a Superscope cassette recorder; a Polaroid camera; two Jensen speakers; Heil ESS speakers; Realistic headphones, and a gold ring with a single diamond. During the execution of the warrant for the De Caro home, McCready made numerous observations that were part of the basis for the issuance of a search warrant for the Rothbrust home.

At the subsequent preliminary examination, the municipal court suppressed the observations of Kollinzas on grounds of illegal entry, but ruled that there was an independent basis for the issuance of the search warrant for the De Caro home. On the denial of the Penal Code section 1538.5 suppression motions, the superior court ruled that by listing his home for sale with the multiple listing service, De Caro issued an implicit invitation to the public and thereby waived his rights as to the entry of Kollinzas with Balalis.[5]

■ Where a search warrant affidavit[6] contains constitutionally offensive matters (here, arguendo, the observations of Kollinzas, discussed below), the matter will be excised and the validity of the warrant tested by the remaining information (*People* v. *Cook* (1978) 22 Cal.3d 67, 83 [148 Cal.Rptr. 605, 583 P.2d 130]; *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 100-101 [104 Cal.Rptr. 226, 501 P.2d 234]). The test of probable cause is approximately the same as that for an arrest, namely,

---

[5]In view of this conclusion, the court made no ruling as to an independent basis for the warrant.

[6]Here, the transcript of the oral testimony received in lieu of written affidavits in support of the warrant is deemed to be an affidavit (*Charney* v. *Superior Court* (1972) 27 Cal.App.3d 888, 891 [104 Cal.Rptr. 213]; Pen. Code, § 1526, subd. (b)).

whether the facts before the issuing magistrate are such as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused (*Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485]). Only the probability and not a prima facie showing of criminal activity needs to be demonstrated (*People* v. *Neusom* (1977) 76 Cal. App.3d 534, 541 [143 Cal.Rptr. 27]). Probable cause to search is established when the affidavit (or its equivalent) states facts that make it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant was sought (*People* v. *Cook, supra,* 22 Cal.3d 67, fn. 6 at p. 84). The quantum of evidence required to constitute probable cause must be judged in light of the facts and circumstances of each case (*Skelton* v. *Superior Court, supra,* 1 Cal.3d 150). Doubtful or marginal cases should be largely determined by the preference to be accorded to warrants (*People* v. *Barnum* (1980) 113 Cal.App.3d 340, 346 [169 Cal.Rptr. 840]). Our duty is to save the warrant if we can do so in good conscience (*Caligari* v. *Superior Court* (1979) 98 Cal.App.3d 725, 729 [159 Cal.Rptr. 534]).

Here, the issuing magistrate heard the testimony of McCready, Connell and others who were involved in the lengthy and detailed investigation of the Rothbrust and De Caro burglaries and resulting insurance claims. The numerous Rothbrust claims and De Caro's claim related to burglaries and thefts that occurred in the period between November 30, 1974, and March 24, 1977. The connection between De Caro and the Rothbrusts was established unequivocally. On De Caro's claim report for the 27 items taken on November 14, 1976, De Caro indicated that 3 items (the Sansui receiver QRX 7001, turntable SR 3080 and cassette recorder) had been obtained from a Mr. Robertson at a nonexistent Clovis Avenue address with a telephone number listed for the Rothbrusts' home.

McCready ascertained that "Mr. Robertson" was Rothbrust, who was also a contractor and the owner of the M & R Construction Company, whose report was involved in De Caro's separate property damage claim. In 1975, De Caro witnessed Rothbrust's signature for the insurer's settlement of the Rothbrust claim for the items stolen from their truck in 1975. These included a Nikkormat camera and two lenses, identical to those subsequently listed on De Caro's November 15, 1977, insurance claim.

■ Given the admitted connection between De Caro and the Rothbrusts, the similarities of many of the items found on De Caro's and the Rothbrusts' lists is striking. Even assuming that these similarities were only the result of easily sellable and desired items that are usually the subject of burglaries, there were several identical items that McCready saw at the Rothbrust home to which he was invited on June 13, 1977: the Sansui QRX 7001 receiver and turntable, the 19-inch portable Sony television, the Panasonic portable radio RF 388, and the Sony Beta Max video and its digital timer. These very items with identical numbers appeared on De Caro's report, as well as on the Rothbrusts' reports of the 1975 and 1976 burglaries of their home.

When McCready contacted Breuner's to verify that De Caro had purchased the 19-inch Sony portable television in the summer of 1975, as claimed, Breuners indicated no active accounts for De Caro or his wife. However, Breuners checked the Rothbrust invoices and discovered that on December 6, 1975, they had purchased two articles identical to those previously purchased on November 13, 1975, and reported stolen in the theft from their truck on November 15, 1975. In the light of all the circumstances, the court properly concluded that the similarities were far beyond the normal kinds of errors usually found on insurance claims.

■ ■ Connell's testimony that De Caro indicated that the items purchased from "Robertson" were stolen provided at least an additional ground for suspecting that both De Caro and the Rothbrusts were engaged in presenting insurance claims that each knew were false. The gravamen of the offense (former Ins. Code, § 556, subd. (a)) is the intent to defraud (*People* v. *Scofield* (1971) 17 Cal.App.3d 1018, 1025 [95 Cal.Rptr. 405]). The intent to defraud may be inferred from the surrounding circumstances (*People* v. *Reed* (1969) 190 Cal.App.2d 344, 353 [11 Cal.Rptr. 780]). De Caro's reporting of values in excess of the actual value of an item, in and of itself, was sufficient (*People* v. *Kanan* (1962) 208 Cal.App.2d 635, 638 [25 Cal.Rptr. 427]).

Thus, it was probable and reasonable for McCready to believe that some of the items previously reported as stolen to the De Caro and Rothbrust insurers could be found in the De Caro home. Further, a magistrate can reasonably conclude that the residence of the suspect is the logical place to look for specifically incriminating items based on the nature of the crimes and the items sought (*People* v. *Stout* (1967)

66 Cal.2d 184 [157 Cal.Rptr. 152, 424 P.2d 704]; *People v. Miller* (1978) 85 Cal.App.3d 194, 204 [149 Cal.Rptr. 204]).

Contrary to the ·contentions of De Caro and Rothbrust, *People v. Reed, supra,* 190 Cal.App.2d 344, supports the issuance of each of the search warrants here. In *Reed,* the defendants were charged with insurance fraud in violation of former Insurance Code section 556. The court held, at page 355, that a conspiracy to defraud could be inferred from the circumstances..

We conclude that the warrants for the De Caro and Rothbrust· homes[7] were based on probable cause, independent of the observations of Kollinzas.

In view of the above, we need not discuss in detail the contention concerning the legality of the entry of the De Caro home by Kollinzas (an agent of the police) who admittedly posed as a potential purchaser. The People argue that the court below properly concluded that by listing his home with a multiple listing service, De Caro waived his Fourth Amendment rights and had no reasonable expectations of privacy as to the entry of Kollinzas and in any event, the items were in plain sight. ▆ As this court (Div. One) recently reiterated, the highest Fourth Amendment protection extends to persons in their homes (*Soli v. Superior Court* (1980) 103 Cal.App.3d 72, 78-79 [162 Cal.Rptr. 840]). A search within the meaning of the federal and state constitutional guarantees (U.S. Const., 4th Amend.; art. I, § 13 of the state Const.) occurs whenever a person's reasonable expectation of privacy is violated by a governmental intrusion (*People v. Ammons* (1980) 103 Cal.App.3d 20, 26-27 [162 Cal.Rptr. 772]; *People v. Edwards* (1969) 71 Cal.2d 1096, 1100-1104 [80 Cal.Rptr. 633, 458 P.2d 713]), including observations made from a place to which the public is not expressly or implicitly invited (*Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 634, 638 [108 Cal.Rptr. 585, 511 P.2d 33]). Before the plain view doctrine can be invoked, the police must have a right to be in the position from which they make the plain view observation (*People v. St. Amour* (1980) 104 Cal.App.3d 886, 891 [163 Cal.Rptr. 187]).

---

[7]No separate contentions are raised as to the search warrant subsequently issued for the Rothbrusts' home. As to that warrant, the People concede the Rothbrusts' standing to raise De Caro's Fourth Amendment claims (*Kaplan v. Superior Court* (1971) 6 Cal.3d 150, 156-162 [98 Cal.Rptr. 649, 491 P.2d 1]).

By the multiple listing of his home for sale, De Caro's consent to entry and any implied invitation extended only for the limited and specific purpose of permitting the entry of a real estate agent accompanied by bona fide potential purchasers of the home. De Caro had a reasonable expectation that absent compulsion by legal process, his home would not be entered by an agent of the police (cf. *People* v. *Dickson* (1979) 91 Cal.App.3d 409, 414-415 [154 Cal.Rptr. 116]; *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 243 [118 Cal.Rptr. 166, 529 P.2d 590]; *People* v. *Krivda* (1971) 5 Cal.3d 357, 367 [96 Cal.Rptr. 62, 486 P.2d 1262]; *People* v. *McGrew* (1969) 1 Cal.3d 404, 412 [82 Cal.Rptr. 473, 462 P.2d 1]; *Piazzola* v. *Watkins* (N.D. Ala. 1970) 316 F.Supp. 624, 628, affd. (5th Cir. 1971) 442 F.2d 284; *United States* v. *Phillips* (9th Cir. 1974) 497 F.2d 1131). (Cf. also *Stoner* v. *California* (1964) 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889], defendant's reasonable expectation of privacy in his hotel room violated when police were permitted to enter for criminal investigatory purposes.) The People's contention also overlooks this state's well established line of authorities that condemn unlawful entries by a ruse or trick (*People* v. *Lathrop* (1979) 99 Cal.App.3d 967, 971 [160 Cal.Rptr. 654]; *People* v. *Mesaris* (1970) 14 Cal.App.3d 71, 75, fn. 2 [91 Cal.Rptr. 837]; *In re Robert T.* (1970) 8 Cal.App.3d 990, 993 [88 Cal.Rptr. 37]; *People* v. *Reeves* (1964) 61 Cal.2d 268, 273 [38 Cal.Rptr. 1, 391 P.2d 393]).

The orders are affirmed.

Rouse, J., and Miller, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied November 13, 1981.