[Crim. No. 7764. Second Dist., Div. One. Aug. 6, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. RALPH R. BENSON, Defendant and Appellant.

Cantillon & Cantillon and Richard H. Cantillon for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney, Harry Wood and Harry B. Sondheim, Deputy District Attorneys, for Plaintiff and Respondent.

LILLIE, J.—Benson, Isaac Matloff and Edwin T. Harder were charged by information with conspiracy to commit grand theft and to violate section 556[1] of the Insurance Code (count I), in count II with a violation of section 556, *supra,* on or about March 10, 1960, and in count III with another violation of section 556 on or about April 28, 1960. After the commencement of trial to a jury, Matloff and Harder entered guilty pleas to attempt to violate section 556. Trial without a jury was then continued as to Benson only; he was adjudged guilty on all three counts. The appeal is from the judgment (order granting probation) and the order denying a new trial.

Benson is an attorney; Matloff, a chiropractor, and Harder, an osteopath. On December 11, 1959, one Buchholz was involved in a rear-end collision. He sustained no personal injuries, although one Orr became liable to Buchholz for property damage to Buchholz' car. Three days later Matloff came to Buchholz' home; he was referred to Buchholz by an employee of the agency where the car was taken for repairs. The employee had been promised $25 by Matloff for every rear-end collision case referred to him. Matloff told Buchholz, whom he had never previously met, that the latter "could make some money on this accident because it was a rear-end collision, and if I (he) would say I (he) had a whiplash, that there would be no way to prove otherwise." Buchholz was also told that Benson would be the attorney handling the case and that he would be contacted by Benson within a few days. Buchholz advised Matloff that he would think it over. Two days after Matloff's visit, a Mr. Potter from Benson's office

---

[1] Section 556 of the Insurance Code: "It is unlawful to: (a) Present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance. (b) Prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented or used in support of any such claim. Every person who violates any provision of this section is punishable by imprisonment in the State prison not exceeding three years, or by fine not exceeding one thousand dollars, or by both."

called at Buchholz' home. He filled out some papers and asked Buchholz to sign them; Buchholz said he wanted to "sleep on it" before employing Benson. Buchholz then went to the police who, in turn, contacted the District Attorney's office; Buchholz was told to play along—or, in effect, to act as a decoy. Potter paid Buchholz a second visit about a week later. Buchholz signed certain papers and explained how the accident happened. Thereafter, Matloff came to Buchholz' house on six or seven occasions; only one treatment was given, however. Buchholz told Matloff that he was not hurt; but Matloff stated that the bigger his (Matloff's) bill, the bigger would be Buchholz' recovery. Benson admits that the medical bills and reports as to Buchholz were "undeniably false." One such bill stated that Buchholz had been given 26 treatments. It was forwarded by Benson on March 10, 1960, to Orr's insurance carrier. After the company requested an itemized bill, on March 23, a more detailed bill was forwarded by Benson—it made reference to various dates when Buchholz had been assertedly treated by Matloff.

On March 4, 1960, Buchholz took Robert Meng, an investigator from the District Attorney's office, to see Matloff. Posing as a person who had been recently involved in a rear-end collision with one Hawkins, although such was not the fact, Meng told Matloff that he had not been injured; Buchholz had previously advised him, however, that he (Meng) might make some money and Matloff agreed. In this regard, Matloff stated: "You are always injured in a rear-end collision. You get a whiplash." When mention was made of getting an additional doctor, Matloff said that he and Harder had been working with Benson for quite some time; that Harder would give the same diagnosis after he had seen Matloff's report. Matloff took some X-rays; he then telephoned Benson who talked to Meng. Benson asked Meng if he was working; when Meng said "No," Benson said, "You were working." Meng replied, "Well, okay." Meng was afterwards seen by Harder. As in the instance of Buchholz, Benson now admits that Matloff and Harder submitted false reports for service rendered Meng. These bills and reports were forwarded by Benson to the insurance carrier for Hawkins.

Although not specifically charged in the information, evidence was introduced (apparently without objection) that Benson had forwarded to still another insurance carrier a false report of Dr. Harder pertaining to one Villabisencio.

It appears that Villabisencio received a bill from Harder for 14 visits, whereas the latter had seen Villabisencio not more than 5 times. When Villabisencio telephoned Benson about the matter, Benson said: "Well, you sign it, I am your attorney, and if I tell you to sign it, you sign it; don't sign anything else unless I tell you." Villabisencio signed the bill; subsequently Benson submitted to the insurance company a bill similar to that signed by the client.

Much of the People's case against Benson consisted of certain recorded conversations he had with Buchholz and Meng. On January 14, 1960, Buchholz went to Benson's office on order of the District Attorney's office; prior thereto a miniphone was installed on his person. Benson told Buchholz that he was in touch with California Casualty, the insurance carrier for Orr, and that he would also be in touch with Matloff. Buchholz testified that in response to Benson's question he told appellant that he was not hurt.[2] In February or March Buchholz had another conversation with Benson, this time by telephone, wherein he told Benson that his neck and back were not injured.

On March 25 Meng telephoned Benson. The conversation was recorded, the transcription thereof being as follows:

"OFFICE GIRL: Hello, Mr. Benson's office.

"MR. MENG: May I speak to Mr. Benson, please?

"OFFICE GIRL: Who is calling?

"MR. MENG: This is Bob Meng.

"OFFICE GIRL: Bob Meng?

"MR. MENG: Meng, M-e-n-g.

"OFFICE GIRL: Do you want to know when your case is coming on?

"MR. MENG: No. I'd like to discuss something with him if I could.

"OFFICE GIRL: This isn't regarding a case, though, is it?

"MR. MENG: Yes, it is.

"OFFICE GIRL: Will you hold the line a second, please.

"MR. MENG: All right.

"MR. BENSON: Hello, Bob.

"MR. MENG: Yes.

---

[2] When the tape recording was played to Benson, then under cross-examination, Buchholz was heard to say: "You know, there is nothing wrong with me, I don't want to get into any trouble." Asked if his memory was refreshed that Buchholz made such a statement, Benson replied: "Yes, he did." The recording was admitted into evidence without objection.

"MR. BENSON: Ralph Benson.

"MR. MENG: Yeah; how are you?

"MR. BENSON: Okay.

"MR. MENG: Listen, I got a phone call last night from this fellow Hawkins, the guy that hit me——

"MR. BENSON: Yeah, he's out of his mind.

"MR. MENG: (Laughing)

"MR. BENSON: He's out of his mind.

"MR. MENG: Well, what do you say——

"MR. BENSON: He wants to settle this for very little money.

"MR. MENG: Uh-huh.

"MR. BENSON: Did he mention any money to you?

"MR. MENG: No, he didn't, but he was——

"MR. BENSON: So that his company wouldn't be bothered.

"MR. MENG: Well, he seems kind of shook up about it, and he's got me a little bit shook up because——

"MR. BENSON: Why—why should it shake you up?

"MR. MENG: Well, see—you have talked to Matloff or Harder about this thing?

"MR. BENSON: Why?

"MR. MENG: Well, I told them—you know I wasn't hurt actually, and I told Harris[3] that night—the night that he came out to my house——

"MR. BENSON: That's all right.

"MR. MENG: Well——

"MR. BENSON: That's no problem.

"MR. MENG: Well, what do you mean it's no problem, I mean, suppose I have to go to court with this guy, or something?

"MR. BENSON: I tell you what—you're upset.

"MR. MENG: Huh?

"MR. BENSON: You sound like a girl who has just found out she's pregnant.

"MR. MENG: Well—(laughing) can you,—I mean, you see my point, in other words——

"MR. BENSON: I see your point. I've been a lawyer 14 years, I can see your point.

"MR. MENG: Well——

"MR. BENSON: Just forget it.

"MR. MENG: Well——

"MR. BENSON: Look, I'll take care of it. I mean, this case can be settled for around $1500.

---

[3]Harris is an attorney, employed at that time by Benson.

"MR. MENG: Uh-huh.

"MR. BENSON: If you—if you want to feel that's not enough —that's too much money for you—this guy—other guy will probably give you $200 to forget it.

"MR. MENG: Uh-huh. Well, whatever you say, you're the boss; but I wanted to talk to you about the case, as I say——

"MR. BENSON: All right, . . . from work?

"MR. MENG: Huh?

"MR. BENSON: You lost any time from work?

"MR. MENG: Did I lose any time from work?

"MR. BENSON: Yeah.

"MR. MENG: No, see, I told Joe Harris that night, see, I wasn't work—huh?

"MR. BENSON: That's okay. Now, look don't worry about this. Just don't talk to anybody but me and Dr. Matloff, and quit talking to the other guy.

"MR. MENG: Okay, you're the boss, whatever you say.

"MR. BENSON: Okay?

"MR. MENG: Okay.

"MR. BENSON: I'll be in touch with you.

"MR. MENG: Righto.

"MR. BENSON: Good-bye.

"MR. MENG: Good-bye."

On April 18 Matloff signed a medical report pertaining to Meng. Various questions in the report were answered falsely—these false answers, according to Meng, he did not furnish to Matloff. The next day, pursuant to Matloff's suggestion, Meng took one or two copies of this report to Benson's office. At that time he had a conversation (likewise recorded) with the appellant who, while under direct examination, read its transcription into evidence:

"MR. MENG: Well, listen, you undoubtedly talked to Joe Harris about this. Like I said Matloff called me and asked me to come out and fill this thing out with him, which is fine, except he has changed a few things on it, and that's fine as long as I don't have to go to court, but, . . . , he's got nothing but a bunch of lies on that thing."

"MR. BENSON: Where are his lies?

"MR. MENG: Well, to begin with, he's got a different date on there as to the date that Joe came out to see me, and Joe came out the same day that I saw him for the first time.

"MR. BENSON: Makes it seem though you didn't.

"MR. MENG: Right.

"Mr. Benson: What's the date?

"Mr. Meng: I don't remember exactly.

"Mr. Benson: Did you go to the doctor the next day?

"Mr. Meng: No, I didn't.

"Mr. Benson: Well, that's something you and the doctor must decide between yourselves in matters of your own conscience.

"Mr. Meng: Well, as I say, everything's fine as long as I don't have to go to court because . . . , that's all I got to do is get court [sic] in a lie or something and I'd spend ten years in jail."

"Mr. Benson: Well, I don't know how many times you have seen him. I wasn't there. Whatever it is, it is, and I go by and submit to the company whatever is said to me by the doctor. If you feel this is a lie, we'll drop the whole case right now."

"Mr. Meng: Well, I——

"(then Mr. Benson says something unintelligible.)

"This thing is dropped.

"Mr. Meng: Whatever you think, as I say I don't know, like I told Joe the night he came out to fill out this accident form, or whatever the heck it is, I told him then the same thing I told Matloff, that I wasn't actually hurt in the thing.

"He said, 'Well, don't talk to me. Talk to Matloff and Mr. Benson.'

"And I said, 'All right,' and when I talked to you on the phone——

"Mr. Benson: I am not going to participate in a fraud. If this is a correct—if you and the doctor say this is correct, I'll go along with you. If you say it is incorrect——

"Mr. Meng: Well, as I say——

"Mr. Benson: I am not going to participate in a fraud. I never had for 14 years and I don't intend to.

"Mr. Meng: Fine. (and then something unintelligible)

"Mr. Benson: If you say this is untrue, let's forget the whole thing. You figure it out for yourself.

"Mr. Meng: I don't know.

"Mr. Benson: What's your age?

"Mr. Meng: Thirty-five.

"Mr. Benson: Thirty-five and you haven't learned anything about life yet.

"Mr. Meng: Haven't learned anything about life?

"Mr. Benson: Yeah, life.

"Mr. Meng: Yeah, I learned something about life.

"Mr. Benson: All right. Did you get a third copy of this?

"Mr. Meng: No. He said he wanted to keep one copy and send one copy to Dr. Harder.

"Mr. Benson: I*ts* all right.

"Mr. Meng: Yeah, everything was fine until this guy Hawkins called me up and then——

"Mr. Benson: Who's Hawkins?

"Mr. Meng: That's the guy that hit me.

"Mr. Benson: What did he say?

"Mr. Meng: He wanted to know what the heck I was doing and I said, 'What do you mean, what am I doing?' And he said, 'Well, I got a letter from my insurance company saying that somebody's filing suit against me,' and I said, 'Buddy, I don't know what you're talking about.' Remember I called you and told you he called me?

"Mr. Benson: Yeah. So what? Hawkins is not supposed to call you.

"Mr. Meng: Huh?

"Mr. Benson: Hawkins is not supposed to call you.

"Mr. Meng: Well, as I say, I've never had that happen to me before and I didn't know what was going on.

"Mr. Benson: At the time of this collision you were unemployed and looking for work.

"Mr. Meng: Right.

"Mr. Benson: You earned about $150.00 a month.

"Mr. Meng: $150.00 a week.

"Mr. Benson: A week.

"Mr. Benson: When did you finally get back to work?

"Mr. Meng: About two and a half weeks, February 18th.

"Mr. Meng: I haven't actually, I've had a few odd jobs,——

"The Witness: (Reading)

"My wife is still working, thank God, but I've only had a couple of odd jobs.

"Mr. Benson: How many children do you have?

"Mr. Meng: Beg pardon?

"Mr. Benson: How many children?

"Mr. Meng: Two. Boy and a girl.

"Mr. Benson: When was the first time you went back to work after February 18th.

"Mr. Meng: About three weeks ago. I had a job for four days.

"Mr. Benson: What day did it start?

"Mr. Meng: Beg pardon?

"Mr. Benson: What day did it commence?

"Mr. Meng: Have you got a calendar?

"Mr. Benson: Right.

"Mr. Meng: Well, let's see. Today is the—what's today? The 19th.

"Mr. Benson: Well, they've got you down for one week so I'll have to turn it in. Well okay as soon as I get the report from Dr. Harder I'll submit a copy to you and give a copy to the company and we'll have this case settled.

"Mr. Meng: All right. Will you get in touch with me then?

"Mr. Benson: Okay.

"Mr. Meng: Do you want me to call you or what?

"Mr. Benson: No, I'll be in touch with you. I've got your number.

"Mr. Meng: Well, as I say I'm not adverse to making a buck, but you know.

"Mr. Benson: Yeah.

"Mr. Meng: As long as I don't have to go to court, I don't care.

"Mr. Benson: Okay.

"Mr. Meng: Okay, thanks very much."

On April 28, Benson mailed to Hawkins' insurance company Matloff's report, testified to by Meng, and a report from Harder. Matloff's report included the following answers to the following questions: "How many times have you treated the patient? 26 times. What is the precise location, nature and extent of the injury as revealed by your examination? Occipital headache, neck tension, sacro-iliac tension. What is the period of time patient has been confined at home or in hospital? One week."

Benson testified on his own behalf. He stated that he relied upon the medical reports and oral information furnished him by his clients' doctors. The ultimate issue for determination, therefore, was appellant's knowledge or lack of knowledge of the falsity of the Matloff and Harder reports. He challenges the adverse finding in this regard; we now take up this first assignment of error.

Although appellant concedes that the resolution of conflicting inferences is for the trier of fact, he now asks this court to say that as a matter of law an inference of guilt cannot be drawn from the evidence adduced. That being so, he further contends, "the element of wilfulness essential to each

offense is totally lacking.[4] Furthermore, he says the conversations out of his presence between Buchholz, Meng, Matloff and Harder were inadmissible since the existence of a conspiracy cannot be inferred unless appellant had the required knowledge of the falsity of the claims; on the other hand, it is conceded, the existence of a conspiracy can be inferred if appellant had such required knowledge.

■ It has been stated that in prosecutions for violating section 556 of the Insurance Code, "The basis of the offense alleged is the defendant's intent to defraud. . . ." (*People* v. *Turley*, 119 Cal.App.2d 632, 636 [259 P.2d 724].) ■ A person who knowingly or wilfully submits a claim, knowing it to be false, necessarily does so to defraud. (*People* v. *Haydon*, 106 Cal.App.2d 105 [234 P.2d 720].) ■ Generally, "Whether [a defendant] made these representations in good faith or whether he made them knowing they were false, or in reckless disregard of the truth and without information justifying the belief, [are] questions for the [trial court].

■ Intent cannot always be proved by direct evidence. Many times it has to be determined from a consideration of all the circumstances surrounding the doing of an act . . . An intention to defraud is an essential element of the charged offenses, but such intention is inferable from all the facts of the case and need not be substantially proved. . . ." (*People* v. *Henderson*, 79 Cal.App.2d 94, 117-118 [179 P.2d 406].) See also *People* v. *Burnham*, 194 Cal.App.2d 836, 841-842 [15 Cal.Rptr. 596]; *People* v. *Proctor*, 169 Cal.App.2d 269, 279 [337 P.2d 93].) Although his counsel has extensively argued that appellant's case is in effect *sui generis*, we are satisfied that the present point is governed by the familiar rules stated above. ■ It has been said countless times, and was rather recently reiterated by the Supreme Court, that, "The choice of which inference is to be drawn from the facts, where more than one reasonable inference is possible, is the function of the jury." (*People* v. *Sweeney*, 55 Cal.2d 27, 51 [9 Cal.Rptr. 793, 357 P.2d 1049].) ■ That the challenged inference of actionable knowledge or scienter and reckless disregard of the truth was reasonably drawn is clear from the following facts.

---

[4] "The word 'wilfully' as used in criminal statutes implies a purpose or willingness to commit the act (Pen. Code, § 7, subd. 1), and although it does not require an evil intent, it implies that the person knows what he is doing intends to do what he is doing and is a free agent." (*In re Trombley*, 31 Cal.2d 801, 807 [193 P.2d 734].)

With respect to the Buchholz transaction, Benson was advised on two separate occasions that Buchholz was not injured. Thus, on January 14 (the recorded conversation) Buchholz told appellant that he was not hurt or injured. Again, in February or March, Buchholz telephoned appellant and stated that his neck and back were not injured. Notwithstanding these unequivocal statements, appellant shortly thereafter forwarded the medical reports to the responsible insurance carrier; such action belies a cautious concern for the true facts which is expected of an attorney with 14 years in the practice, most of which practice (appellant stated) was in this particular field. A different picture is portrayed in appellant's briefs, wherein he points to several asserted discrepancies in the Buchholz testimony, recorded and otherwise; other arguments are directed toward the lack of credence to be accorded this witness. Despite a painstaking effort in this regard, all these arguments were for resolution by the trier of fact. ■■■ Appellant's testimony, on the other hand, reflects more than mere discrepancies; it contains an outright contradiction, upon cross-examination, of what he testified to while under direct examination. (See footnote 2 herein.) When false testimony is thus given, it is evidence of consciousness of guilt from which, along with other evidence, a determination of guilt may be inferred. (*People* v. *Wayne,* 41 Cal.2d 814, 823 [264 P.2d 547].) Indeed the inference in question does, and should, carry more weight when the false testimony comes from the lips of an attorney; this, despite appellant's claim that there was no ''intentional falsity.'' The area of interrogation related to pivotal points in the case and not minor or incidental matters.

■■■ With respect to the Meng transaction, again Benson was twice informed of the true facts. On March 25, Meng advised appellant by telephone that he ''wasn't hurt actually,'' and Benson replied, ''That's all right.'' Though thus previously advised, Benson in the same conversation later said: ''That's no problem,'' ''just forget it,'' and ''look I'll take care of it.'' The entire conversation has heretofore been quoted; considered as a whole, it supports the trial court's implied conclusion that appellant had little concern for his responsibilities in the premises and was determined, recklessly or fraudulently, to proceed forthwith with the processing of his client's claim. Meng again informed Benson of the falsity of his claim at appellant's office on April 19—this conversation has also been heretofore quoted *in toto.* Meng told appellant

that Matloff's report contained "nothing but a bunch of lies" which, of itself, warranted some restraint on appellant's part; the report, devoid of any changes, was nevertheless mailed to the responsible insurance company. It is, of course, true that in the course of this conversation Benson told Meng that he was "not going to participate in a fraud . . . never had for 14 years . . . don't intend to." He also stated: "Well that's something you and the doctor must decide between yourselves in matters of your own conscience." A scrupulous concern for his duties as an attorney would have dictated that appellant not thus stand aside and let others determine where the truth lay; certainly appellant's position, thus revealed, seems out of harmony with his statutory duty, "To employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth . . ." (Bus. & Prof. Code, § 6068, subd. (d).) Situations will arise where there is an *honest* difference of opinion, but this is not such a case.

■ ■ As noted earlier, appellant concedes that the existence of a conspiracy can be inferred if the evidence shows that he had the knowledge requisite to the commission of the substantive offenses; he also concedes, apparently not challenging the fact that a prima facie case was made out, that the declarations and statements made by his coconspirators outside his presence would be admissible. (*People* v. *Robinson,* 43 Cal.2d 132, 137 [271 P.2d 865].) These statements we briefly refer to. On February 5, Matloff told Buchholz: "Well, you see, the point is the insurance doesn't know what shape you're in, and talk about Benson, he doesn't care whether you're in bed or out of bed. It wouldn't make any difference." On March 4, Matloff told Meng that he and Harder had been working with Benson "for quite some time"; that Harder would see his X-rays and give the same diagnosis. On March 22, Meng advised Harder that neither he nor Buchholz had been injured in any accident. Harder then told Meng not to worry about it because Benson would see to it that neither of them would have to go to court; he also told Meng that he had been working with Benson "for about three years." On March 23, Meng told Matloff that Harder had not examined either Buchholz or himself; Matloff replied that it didn't make any difference because Harder had worked with him and Benson and knew what to do. This and other evidence, unnecessary to relate, clearly show a corrupt agreement among the parties concerned (accompanied by overt acts) to commit the sub-

stantive offenses charged; that is the gist of the crime of conspiracy.

As his next assignment of error, appellant contends that he was entrapped; he does so notwithstanding his consistent denial that the crimes complained of were committed. His position is similar to that of the appellant in *People* v. *Lee*, 9 Cal.App.2d 99 [48 P.2d 1003], where Lee denied that any sale of contraband was made or that he had any narcotics in his possession, but still argued entrapment. ▮▮▮ At pages 109, 110, the court there said: ''It is our understanding that the defense of entrapment is a positive defense imposing upon an accused the burden of showing that he was induced to commit the act for which he is being prosecuted. *The invocation of the defense necessarily assumes that the act charged as public offense was committed.*'' (Emphasis added.) The holding in *Lee* was followed in *People* v. *Gelardi*, 77 Cal. App.2d 467, 477 [175 P.2d 855], which quotes the language of the court above emphasized; the Supreme Court without a dissenting vote thereafter denied a hearing in *Gelardi*. Later cases in accord include *People* v. *Polsalski*, 181 Cal.App.2d 795 [5 Cal.Rptr. 762]. Appellants claims that the declaration in *Polsalski* with reference to entrapment is dictum; dictum or otherwise, the law seems clear that appellant's position is inconsistent, and furthermore no California case is cited in support of the present assignment. Under the circumstances, we need not discuss the additional claims (although neither is tenable) that appellant was *in fact* entrapped or that the evidence establishes entrapment as a matter of law.

▮▮▮ As his next contention, appellant argues he could not be convicted of violating section 556 of the Insurance Code because neither Buchholz nor Meng, as distinguished from a policyholder, had a contract of insurance with the companies to whom the claims were presented; this is not the first time such a contention has reached our reviewing courts. As provided in the statute (footnote 1), the false or fraudulent claim must be for the payment of a loss ''under a contract of insurance.'' The claim of Buchholz and Meng, says appellant, were *ex delicto* and not *ex contractu*, particularly in the absence of evidence that the policies in question gave either of the supposedly injured persons direct rights inuring to his benefit. This later type of policy is encountered in *Connell* v. *Clark*, 88 Cal.App.2d 941 [200 P.2d 26], and *Giordano* v. *American Fid. & Cas. Co.*, 97 Cal.App.2d 309 [217 P.2d 444], being written pursuant to the direction of statute or ordi-

nance; there are also cases where the argument has been made that the contract of insurance was for the benefit of unnamed third persons. (See generally *Johnson* v. *Holmes Tuttle Lincoln-Mercury, Inc.*, 160 Cal.App.2d 290 [325 P.2d 193].) Ordinarily, however, judgment must first be secured against the insured before the injured person has a right of action against the insurer on the policy. (Ins. Code, § 11580.)

It was pointed out earlier that the gravamen of the substantive offense is the defendant's intent to defraud. The Legislature realistically provided in the concluding paragraph of section 556 that *"Every* person who violates any provision of this section is punishable by imprisonment . . ."" (Emphasis added.) In turn, we propose to be realistic in our interpretation of its coverage, particularly in the light of the circumstances at bar. It is a matter of common knowledge that insurance companies negotiate settlements directly with injured parties or their attorneys because of the liability of their insured. Benson testified that he sent letters to both companies, as well as their insured (Orr and Hawkins), stating that all communications respecting the claims should be sent to him directly. Benson was no neophyte in this area of practice—it represented, he stated, about 60 per cent of his professional activities. The insurance companies subsequently dealt with appellant directly—in line with customary practice and pursuant to Benson's instructions.

Furthermore, appellant cites no authority to sustain his position on the specific point in question save for a New York case (*People* v. *Learman*, 281 App.Div. 583 [121 N.Y.S. 2d 388] the reasoning of which we are not obligated to follow. In California, however, there is precedent for the respondent's answer to the present ingenious argument. *People* v. *Grossman*, 28 Cal.App.2d 193 [82 P.2d 76] (hearing by the Supreme Court denied) likewise involved a violation of section 556; it also involved a situation where there was no privity between the defendants and the insurance carrier. The defendants included a doctor and a lawyer, and the conviction was affirmed even though the claim was made on behalf of a third party who had no rights under the contract of insurance alleged in the indictment. Only one defendant appealed. Said the court: "The defendant seems to contend that prosecution was bound to show that the contract of insurance . . . imposed liability upon the insurer. The first answer is that prosecution made that showing. The second answer is that the gravamen of the offense alleged was the de-

fendant's intent to defraud. That intent did not depend solely on the legal obligation, if any, arising out of the said contract. [Citation.]'' (P. 202.) Rather recently in *People* v. *Reed,* 190 Cal.App.2d 344 [11 Cal.Rptr. 780], we had occasion to express our agreement with the treatment of the problem in *Grossman;* appellant has told us nothing which serves to change our views in that regard.

 Appellant's final point is that there was an unreasonable search and seizure. He charges that Buchholz and Meng acted as ''decoys'' and that the various recordings obtained by use of the miniphone were inadmissible. There is merit to neither claim. See *People* v. *Wojahn,* 169 Cal.App. 2d 135, 142 [337 P.2d 192] (recorded conversations); *People* v. *Lagomarsino,* 97 Cal.App.2d 92, 97 [217 P.2d 124] (decoys).

For the reasons stated the judgment (order granting probation) and the order denying a new trial are affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied August 24, 1962, and appellant's petition for a hearing by the Supreme Court was denied October 2, 1962.